UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| ECIGRUSA LLC d/b/a WORLDWIDE VAPE DISTRIBUTION, | § § § | |
| Plaintiff, | § § | |
| v. | § § | CIVIL ACTION NO. 3:21-CV-1846-B |
| SILVER STATE TRADING LLC, EMPIRE IMPORTS LLC, and JASON ANGEL, | § § § § | |
| Defendants. | § § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendants Silver State Trading LLC ("Silver State"), Empire Imports LLC ("Empire"), and Jason Angel ("Angel") (collectively, "Defendants")'s Motion to Dismiss Plaintiff's Original Petition (Doc. 10). For the reasons stated below, the Court **GRANTS** the motion.

## I

## BACKGROUND[1]

This is a breach-of-contract case. Plaintiff Ecigrusa, LLC d/b/a Worldwide Vape Distribution ("Worldwide" or "Plaintiff") is a Texas-based company that buys and sells "electronic cigarettes, e-liquids, and other vaping products and accessories on a wholesale basis." Doc. 1-5, Original Pet., ¶ 2. Silver State is a Nevada company that is "in the vaping and e-cigarette business," and "transports, ships, purchases, and . . . sells products within the State of California and in Riverside County[, California]. *Id.* ¶ 3. Empire is a "company headquartered in Riverside County, California."

---

[1] This factual statement is derived from Plaintiff's Original Petition (Doc. 1-5).

*Id.* ¶ 4. "Angel is a merchant who deals in the purchase and sale of electronic cigarettes, electronic cigarette 'pods,'[2] and related products." *Id.* ¶ 5. Angel "operate[s] and control[s]" Silver State and "own[s] and operate[s]" Empire. *Id.* ¶¶ 3–4.

On August 9, 2019, Worldwide's representative Muhammad Kahn ("Kahn") entered into an oral agreement with "Angel, on behalf of himself, Silver State, and Empire," "to purchase 1,086 'JUUL Pods Master Cases' [(each consisting of a 48-pack of four pods for use in JUUL e-cigarette devices)] in eight flavors" ("the JUUL Pods"). *Id.* ¶¶ 9–10. Worldwide "agreed to pay Defendants . . . $736,992 ('the Purchase Price') . . . for the [JUUL Pods] in advance," and Angel "advised Worldwide that Silver State would ship [the JUUL Pods] in approximately two weeks." *Id.* ¶¶ 12–13. Worldwide tendered the $736,992 to Silver State but "shortly after the [JUUL Pods] Order was placed . . . Angel advised Worldwide that Defendants would not be able to fulfill the [JUUL Pods] Order, and . . . would instead return the entire Purchase Price to Worldwide via wire or bank transfer." *Id.* ¶ 15.

On September 13, 2019, Angel wired Worldwide $350,000 and sent Kahn a "text message stat[ing], '[$350,000] is all my bank limit allows for today. I will send or deposit [the] balance [of $386,992] on Monday [September 16, 2019].'" *Id.* ¶¶ 16–17 (second alteration in original). On September 16, 2019, Kahn texted Angel about the funds, "asking '[w]hen are you sending the rest of it.'" *Id.* ¶ 19. (alteration in original). Angel responded, "by the end of the day. Will get it done[,]" but the funds were not returned. *Id.* Instead, "without notice, later . . . [that day] Worldwide

---

[2] Electronic cigarette "pods," also called "vape pods" (hereinafter "pods") are pre-filled cartridges that contain a reservoir of e-liquid to be atomized by an e-cigarette device and inhaled by the user. *See generally* Centers for Disease Control & Prevention, E-Cigarette, or Vaping, Products Visual Dictionary, https://www.cdc.gov/tobacco/basic_information/e-cigarettes/pdfs/ecigarette-or-vaping-products-visual-dictionary-508.pdf.

received at its Dallas, Texas warehouse a shipment . . . of 'SKOL Replacement pods' Worldwide [alleges it] had sold to Silver State[3] and sent to Empire on April 11, 2019" ("the SKOL Pods"). *Id.* ¶¶ 20–21. "Included with the September 16 [SKOL Pods] shipment was [an allegedly bogus] . . . Sales Order from Silver State [totaling $386,992]" indicating that Worldwide had ordered the SKOL Pods on September 12, 2019 (the "Bogus Sales Order"). *Id.* ¶ 22 & Ex. B. Later that night, "Angel sent a text message to . . . Kahn . . . indicating that Defendants were seeking to use the [SKOL Pods] shipment to satisfy their obligations to perform under the [JUUL Pods] Order." *Id.* ¶ 24. Worldwide claims: that it did not order the SKOL Pods from Silver State as the Bogus Sales Order indicated; the SKOL Pods did not conform to the terms of the JUUL Pods order or satisfy the Silver State's refund obligation for that order; the SKOL Pods were essentially worthless at the time of their return; and Defendants had no right to return the SKOL Pods. *See id.* ¶¶ 22–31.

On April 1, 2021, Worldwide filed suit against Defendants in Texas state court, bringing claims for beach of contract, conversion, breach of the implied warranty of merchantability, and violations of the Texas Deceptive Trade Practices Act (DTPA).[4] Doc. 1-5, Original Pet., ¶¶ 39–70. Plaintiff's Original Petition averred that "pursuant to Chapter 17, Subchapter C[,] 'Long-Arm Jurisdiction in suit on Business Transaction or Tort' of the [Texas] Civil Practice & Remedies Code," each Defendant could be served with process "by substituted service on the Secretary of State of Texas . . . [who] shall . . . send the process . . . by registered mail or certified mail, return receipt requested to the registered agent of the corporation: . . . Angel, 16378 Greenridge Circle, Riverside,

---

[3] *See infra*, note 7.

[4] Defendants aver that, prior to the Texas filing, Plaintiff filed and then voluntarily dismissed these same claims in California state court in the case *Ecigrusa, LLC, d/b/a Worldwide Vape Distrib. v. Silver State Trading, LLC, et. al*, Riverside County Case No. RIC1906092 (filed Dec. 12, 2019). Doc. 10, Mot., 2.

CA 92503-9717." Id. ¶¶ 3–5.The Secretary of State's office received Worldwide's filings on July 9, 2021, and on July 15, 2021, it forwarded copies of the Original Petition, Request for Required Disclosures, and Jury Demand by certified mail, return receipt requested. Doc. 14-1, Certificates Serv.

Defendants timely removed the action to this Court. Doc. 1, Not. Removal. On September 15, 2021, after being granted two extensions of time to answer, Defendants filed the present motion to dismiss Plaintiff's claims for lack of jurisdiction. Doc. 6, Elec. Order; Doc. 9, Elec. Order; Doc. 10, Mot. On November 3, 2021, one week after Defendants filed their reply brief, Worldwide filed an Opposed Motion for Leave to Supplement its Response to the motion, claiming that due to technological, travel, and communication issues affecting Kahn and Plaintiff's counsel in September and October 2021, Plaintiff's counsel had not been able to secure affidavits authenticating certain business records attached to Worldwide's response, and requesting leave to file the authenticating affidavits. Doc. 16, Sur-Reply, 2–4. The Court construed the Motion for Leave as a Sur-Reply to the motion to dismiss, granted leave to file the supplemental documents attached to the Sur-Reply (which included Sales Orders, Text Messages, and the Kahn Affidavit), and allowed Defendants to file a Sur-Sur-Reply. Doc. 16-1, Suppl. Docs.; Doc. 19, Order; Doc. 21, Sur-Sur-Reply.

The motion to dismiss is ripe for determination and the Court considers it below.

## II.

## LEGAL STANDARDS

*A.     Rule 12(b)(2)*

When defendants move to dismiss for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2), "[t]he plaintiff bears the burden of establishing jurisdiction but is required to present only *prima facie* evidence." *Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266, 270 (5th Cir. 2006). "In determining whether a prima facie case exists," courts "must accept as true the [p]laintiff's uncontroverted allegations, and resolve in [the plaintiff's] favor all conflicts between the jurisdictional facts contained in the parties' affidavits and other documentation." *Pervasive Software Inc. v. Lexware GmbH & Co. KG*, 688 F.3d 214, 219–20 (5th Cir. 2012) (alterations incorporated) (quoting *Freudensprung v. Offshore Tech. Servs., Inc.*, 379 F.3d 327, 343 (5th Cir. 2004)); *Stuart v. Spademan*, 772 F.2d 1185, 1192 (5th Cir. 1985) ("The court may determine the jurisdictional issue by receiving affidavits, interrogatories, depositions, oral testimony, or any combination of the recognized methods of discovery."). But, the Court need not "credit conclusory allegations, even if uncontroverted." *Panda Brandywine Corp. v. Potomac Elec. Power Co.*, 253 F.3d 865, 869 (5th Cir. 2001).

Personal jurisdiction exists when "the state's long-arm statute extends to the defendant and exercise of such jurisdiction is consistent with due process. Because the Texas long-arm statute extends to the limits of federal due process, the two-step inquiry collapses into one federal due process analysis." *Sangha v. Navig8 ShipManagement Priv. Ltd.*, 882 F.3d 96, 101, 109 (5th Cir. 2018) (quoting *Johnston v. Multidata Sys. Int'l Corp.*, 523 F.3d 602, 609 (5th Cir. 2008)).

To satisfy due process, two elements must be met: (1) the defendant must have purposefully availed itself of the benefits and protections of the forum state by establishing "minimum contacts" with that state such that it would reasonably anticipate being brought to court there; and (2) the exercise of jurisdiction over the defendant must "comport[] with fair play and substantial justice." *Jones v. Petty-Ray Geophysical, Geosource, Inc.*, 954 F.2d 1061, 1068 (5th Cir. 1992) (citations omitted). The "minimum contacts" prong of the due process analysis can be met through contacts that give rise to either general or specific jurisdiction. *Gundle Lining Constr. Corp. v. Adams Cnty. Asphalt, Inc.*, 85 F.3d 201, 205 (5th Cir. 1996). "General personal jurisdiction is found when the nonresident defendant's contacts with the forum state, even if unrelated to the cause of action, are continuous, systematic, and substantial." *Marathon Oil Co. v. Ruhrgas*, 182 F.3d 291, 295 (5th Cir. 1999). By contrast, specific jurisdiction exists "only when the nonresident defendant's contacts with the forum state arise from, or are directly related to, the cause of action." *Gundle*, 85 F.3d at 205.

B.     *Rule 12(b)(5)*

Under Federal Rule of Civil Procedure 4(c)(1), the plaintiff is responsible for serving the defendant with a complaint and summons. If service of process was allegedly insufficient, the defendant may seek to dismiss the plaintiff's complaint under Rule 12(b)(5). *See Cockerham v. Rose*, 2011 WL 1515159, at *1 (N.D. Tex. Apr. 18, 2011). Then, "the plaintiff bears the burden of establishing [the service of process's] validity." *Carimi v. Royal Caribbean Cruise Line, Inc.*, 959 F.2d 1344, 1346 (5th Cir. 1992). "The Court, in making a determination on the validity of service, 'must look outside the complaint to determine what steps, if any, the plaintiff took to effect service.'" *Dunlap v. City of Fort Worth*, 2014 U.S. Dist. LEXIS 59577, at *5 (N.D. Tex. Apr. 7, 2014 (quoting

*Morris v. Liberty Mut. Ins. Co.*, 2009 WL 1941203, at *1 (E.D. La. July 7, 2009)), *report & recommendation adopted by* 2014 U.S. Dist. LEXIS 58418 (N.D. Tex. Apr. 28, 2014).

## III.

## ANALYSIS

First, the Court considers whether it can exercise personal jurisdiction over each Defendant. Because no Defendant established minimum contacts with Texas for any claim asserted, the Court finds that this action must be dismissed pursuant to Rule 12(b)(2). Because the Court dismisses on the basis of personal jurisdiction, it does not consider whether dismissal would be warranted under Rule 12(b)(5).

### A.     *Lack of Personal Jurisdiction*

To begin, the Court finds that it does not have general jurisdiction over any Defendant in this case because no Defendant is essentially "at home" in Texas.[5] Indeed, Plaintiff essentially concedes this point. *See* Doc. 14, Resp., 7 (presenting no argument for general jurisdiction). Accordingly, the Court limits its analysis to specific jurisdiction.

Plaintiff argues that the Court has specific jurisdiction over each Defendant. Specifically, Plaintiff asserts that "Plaintiff and Defendants engaged in at least 35 transactions involving the State

---

[5] General jurisdiction exists where the defendant's contacts are "so 'continuous and systematic' as to render them essentially at home in the forum State." *Goodyear Dunlop Tires Ops., S.A. v. Brown*, 564 U.S. 915, 919 (2011) (citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 317 (1945)). "It is, therefore, incredibly difficult to establish general jurisdiction in a forum other than the place of incorporation or principal place of business." *Monkton Ins. Servs., Ltd. v. Ritter*, 768 F.3d 429, 432 (5th Cir. 2014). Additionally, "[t]he mere act of registering an agent does not create a general business presence in Texas, nor does it act as consent to being [haled] into a Texas court." *Dominion Gas Ventures, Inc. v. N.L.S. Inc.*, 889 F. Supp. 265, 268 (N.D. Tex. 1995). None of the Defendants live in or have their principal place of business in Texas. Doc. 1-5, Original Pet., ¶¶ 3–5. The businesses are also not incorporated in Texas. *Id.* ¶¶ 3–4. Defendants admit that at least one of the Defendants has a designated registered agent in Texas (though only for a specific statutory purpose, not for service); however, this is not enough to demonstrate minimum contacts for general personal jurisdiction. Doc. 10, Mot., ¶ 6; *see also Dominion*, 889 F. Supp. at 268.

of Texas between 2018 and 2019," sometimes with Silver State or Empire acting as the buyer and receiving product shipped from Texas, and other times with Silver State or Empire selling and shipping product to Plaintiff in Texas. *Id.* at 6. It further asserts that Angel is an officer of Silver State and Empire who personally made representations inducing Plaintiff to enter the underlying transaction. *Id.* at 8.

As a threshold matter, the Court notes that while Plaintiff alleges that Silver State and Empire, collectively, engaged in "at least 35" transactions with Worldwide in Texas, it has not argued why Silver State and Empire's transactions may be aggregated for purposes of a personal-jurisdiction analysis. *See id.* at 6; *Diece-Lisa Indus., Inc. v. Disney Enters., Inc.*, 943 F.3d 239, 251 (5th Cir. 2019) ("[Plaintiff] fails to allege any facts that suggest an alter ego relationship between the . . . [Defendant] entities."). The Supreme Court instructs that "the requirements of [minimum contacts and fairness] must be met as to each defendant over whom a state court exercises jurisdiction." *Rush v. Savchuk*, 444 U.S. 320, 332 (1980). It is therefore error to "consider[] the 'defending parties' together and aggregat[e] their forum contacts in determining . . . jurisdiction" although "[n]aturally, the parties' relationships with each other may be significant in evaluating their ties to the forum." *Id.* at 331–32. Thus, the Court considers each Defendant's contacts with Texas separately.

Further, different tests for minimum contacts may apply to different types of claims. *See Danziger & De Llano, L.L.P. v. Morgan Verkamp, L.L.C.*, 24 F.4th 491, 495–96, 500 (5th Cir. 2022) (separately analyzing personal jurisdiction for intentional tort claims and breach-of-contract claims). Thus, the Court also separately considers minimum contacts for each claim.

Below, the Court concludes that no Defendant has established minimum contacts with Texas for any claim asserted. Further, none of the asserted claims arise out of any of Empire's or Angel's

contacts with Texas. Finally, the Court finds that no fairness analysis is necessary because minimum contacts were not established. Having thus found, the Court dismisses for lack of personal jurisdiction.

1.    Minimum Contacts: Breach of Contract

"When determining whether a court has personal jurisdiction over a breach[-]of[-]contract claim, 'only those acts which relate to the formation of the contract and the subsequent breach are relevant,' including 'prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing.'" *Danziger & De Llano*, 24 F.4th at 500; *see also Stuart*, 772 F.2d at 1193 (discussing *Burger King v. Rudzewicz*, 471 U.S. 462 (1985)). Factors that the Fifth Circuit has considered relevant to this analysis are: (1) which party solicited the contract; (2) the extent of negotiations; (3) the location of the communications; (4) the length of the contract performance contemplated; (5) the presence of a choice-of-forum clause or similar provision; (6) the place of performance; (7) the amount of control over performance in the forum state; and (8) whether the defendant contracted with the plaintiff because of the plaintiff's location within the forum state. *See Stuart*, 772 F.2d at 1193–94; *Hydrokinetics, Inc. v. Alaska Mech., Inc.*, 700 F.2d 1026, 1029 (5th Cir. 1983); *Electrosource, Inc. v. Horizon Battery Techs., Ltd.*, 176 F.3d 867, 872 (5th Cir. 1999); *Sw. Offset, Inc. v. Hudco Pub'g Co.*, 622 F.2d 149, 152 (5th Cir. 1980); *Gundle*, 85 F.3d at 206; *Moncrief Oil Int'l, Inc. v. OAO Gazprom*, 481 F.3d 309, 313 (5th Cir. 2007); *see also Lansing Trade Grp., LLC v. 3B Biofuels GmbH & Co., KG*, 612 F. Supp. 2d 813, 822–28 (S.D. Tex. 2009) (providing an overview of Fifth Circuit cases that illustrate the various considerations in a minimum contacts analysis). The ultimate question is whether the allegedly breached contract had a *substantial* relationship to the forum state, considering the totality of the circumstances. *See Burger King*, 471

U.S. at 479; *Stuart*, 772 F.2d at 1192.

    *i.  Silver State*

   Plaintiff argues that "[the] Court . . . has personal jurisdiction over Silver State . . . through [Silver State's] repeated intentional contact with the State of Texas" through contracting with Plaintiff and shipping product to Texas. Doc. 14, Resp., 6. So, the Court finds that the substantial relationship minimum contacts analysis from *Burger King* is applicable.

   The record contains the following relevant evidence submitted by Worldwide: First, Sales Orders showing that Silver State: (1) contracted with Worldwide to ship product to Texas on May 17, 2019; (2) emailed a quote to Worldwide on May 17, 2019; (3) contracted with Worldwide to ship product to Texas on July 24, 2019; (4) contracted with Worldwide to ship product to Texas on August 5, 2019; (5) invoiced Worldwide for shipping on several prior orders on June 18, 2019; and (6) contracted with Worldwide to ship product to Texas on August 9, 2019 (the JUUL Pods order). Doc. 16-1, Sales Orders, 3–24. Second, an affidavit averring that Silver State's representative,[6] Angel, entered into an oral agreement for the JUUL Pods order with Worldwide's representative,

---

[6] Worldwide pleads that "[the August 9, 2019] agreement [at issue in this case] was entered into orally between . . . Khan at Worldwide and . . . Angel, on behalf of himself, Silver State, and Empire." Doc. 1-5, Original Pet., ¶¶ 9–10 (emphasis added). However, the Court finds it cannot credit Worldwide's conclusory allegation that the contract giving rise to this dispute included either Empire or Angel in his individual capacity. *See Panda Brandywine,* 253 F.3d at 869 ("[T]he prima-facie-case requirement does not require the court to credit conclusory allegations, even if uncontroverted."). Looking to Worldwide's own evidence as to Empire, neither the text messages between Angel and Kahn nor the invoices/sales orders attached to Plaintiff's Sur-Reply indicate that Empire was part of the oral agreement Angel and Kahn made, which required shipment by and payment to *Silver State,* or that Angel was acting on behalf of Empire in this transaction. *See* Doc. 1-5, Original Pet., ¶¶ 11–13; Doc. 16-1, Sales Orders, 3–24. As to Angel, Worldwide has not pled or shown that Angel indicated he was contracting in his personal capacity—indeed, the Sales Order reflects that it (like the other three contracts Worldwide executed with Silver State) required payment to Silver State and performance by Silver State. *See id.* Further, the Kahn Affidavit avers that the JUUL Pods contract was between Worldwide and Silver State. Doc. 16-1, Kahn Aff., ¶ 3 ("[Worldwide] placed an order with Silver State . . . in the amount of $736,992. . . . [and] Silver State stated that the order would be filled in approximately two weeks."). Therefore, the Court finds that the August 9, 2019, contract was between Worldwide and Silver State, with Angel acting as a disclosed agent for Silver State.

Kahn, presumably by phone since Kahn has not averred that he and Angel met in person. Doc. 1-5, Original Pet., ¶¶ 9–10; *see* Doc. 16-1, Kahn Aff., ¶ 14. And third, the same affidavit averring that "[i]n the beginning of 2019, a procurement manager employed by Silver State and/or Empire . . . visited [Worldwide's] offices in . . . Texas in order to discuss business on at least one occasion." Doc. 16-1, Kahn Aff., ¶ 17.

Further, the record includes Silver State's uncontroverted representations that it does not and has never had any employees or agents in Texas, has no property in Texas or bank accounts in Texas, does not advertise in Texas, is not licensed to do business in Texas, and has designated an agent for service of process for the limited purpose of complying with a federal act regulating cigarette trafficking but not for other matters. Doc. 10, Mot., 3–4.

The Court finds that the totality of the circumstances shows that Silver State did not establish minimum contacts with Texas by its contractual dealings with Worldwide. *See Danziger & De Llano*, 24 F.4th at 500. Plaintiff or another Defendant appears to have initiated these orders, not Silver State. *See* Doc. 16-1, Sales Orders, 3–24; Doc. 16-1, Kahn Aff., ¶¶ 3 ("On August 9, 2019, [Worldwide] placed an order with Silver State."), 6 ("Empire. . . shipped an old order back to [Worldwide] . . . and indicated that Silver State was seeking to offset the owed balance of $386,992 with the returned goods."); *see Hydrokinetics*, 700 F.2d at 1029. Plaintiff has not demonstrated that Worldwide and Silver State conducted contract negotiations of any length or alleged that Silver State sent the order confirmation emails and invoices from Texas. *See* Doc. 16-1, Sales Orders, 3–24. Rather, the communications that took place in Texas were Worldwide's, and "a plaintiff's . . . unilateral activities [in Texas] cannot establish minimum contacts between the defendant and forum." *Moncrief*, 481 F.3d at 311. There is no evidence to suggest a long-term contract that required

prolonged performance between the parties or contemplated significant involvement with the forum state. Doc. 14, Resp., 6; Doc. 16-1, Kahn Aff., ¶ 8; *see Trois v. Apple Tree Auction Ctr., Inc.*, 882 F.3d 485, 489 (5th Cir. 2018); *Stuart*, 772 F.2d at 1194 ("[T]he agreement entered into by [the defendant] and the plaintiffs did not contemplate a long-term relationship with the kinds of continuing obligations and wide-reaching contacts envisioned by the *Burger King* contract."). These contracts only required discrete shipments of goods in exchange for payment.

Further, Plaintiff has not argued that any of its contracts with Silver State included a choice-of-forum clause or similar provision. *See Hydrokinetics*, 700 F.2d at 1028 n.3. And Silver State was presumably supposed to ship the goods from California, not Texas, so the place of performance was not Texas. *See* Doc. 1-5, Original Pet., ¶ 14 ("Defendants never shipped the Order for the JUUL Pods Master Cases."); *see Electrosource*, 176 F.3d at 874. Also, Silver State had little to no control over performance in Texas—Plaintiff has not asserted that Silver State should have personally delivered the JUUL Pods to Texas. *See Sw. Offset,* 622 F.2d at 152. Nor has Worldwide suggested that Silver State contracted with Worldwide because Worldwide is Texas-based. *See Moncrief*, 481 F.3d at 313.

Finally, while Worldwide alleges that "a procurement manager employed by Silver State and/or Empire" visited Worldwide's place of business in Texas "on at least one occasion" in early 2019 "to discuss business," it does not explain the relationship between this visit and the breached oral Silver State contract. Doc. 16-1, Kahn Aff., ¶ 17; *see Danziger & De Llano*, 24 F.4th at 500. While parties' course of dealings is relevant to minimum contacts, given that: (1) the visitor was a "procurement manager," who presumably procures goods instead of selling them; and (2) all of the Sales Orders in the record dated around "early 2019" are contracts with *Empire* for the purchase of

products from Worldwide, it is likely that the business discussed here was Empire's, not Silver State's. *See* Doc. 16-1, Kahn Decl., ¶ 17; Doc. 16-1, Sales Orders, 3–82.[7] Moreover, even if the procurement manager was acting on behalf of Silver State during the early 2019 visit and soliciting business from Texas by that visit, the instant dispute did not arise out of any contract solicited during the employee's visit—or even any contact related to the employee—but out of a separate oral agreement made months later by Angel (on behalf of Silver State) and Kahn (on behalf of Worldwide). *See* Doc. 1-5, Original Pet., ¶¶ 9–10.

In sum, Silver State's contracts with Worldwide, together with its communications about those orders, are not sufficient minimum contacts with Texas for the court to exercise personal jurisdiction over Silver State on this breach-of-contract claim. *Cf. Stuart*, 772 F.2d at 1189, 1194 ("[T]he isolated shipment of goods to the forum at the instigation of the resident plaintiffs[] and the mailing of payments to the forum do not constitute the minimum contacts necessary to constitutionally exercise jurisdiction."); *Moncrief*, 481 F.3d at 312 ("An exchange of communications in the course of developing and carrying out a contract also does not, by itself, constitute the required purposeful availment of the benefits and protections of Texas law."); *Danziger & De Llano*, 24 F.4th at 502 (5th Cir. 2022) (explaining that "mere fortuity that one company happens to be a Texas resident . . . is not enough to confer jurisdiction" (quoting *Moncrief*, 481 F.3d at 313)).

> ii.    *Empire*

As with Silver State, Plaintiff argues that "[the] Court . . . has personal jurisdiction over . . . Empire through [its] repeated intentional contact with the State of Texas." Doc. 14, Resp., 6. The

---

[7] Given Plaintiff's submitted evidence, which shows that the April 10, 2019, SKOL Pods order was placed by and shipped to Empire, not Silver State, *see* Doc. 16-1, Sales Orders, 43, the Court does not credit Plaintiff's conclusory allegation that the SKOL Pods were sold to "Empire and Silver State." Doc. 1-5, Original Pet., ¶¶ 20–21; *see Panda Brandywine*, 253 F.3d at 869.

record shows that Empire purchased goods from Worldwide for shipment to California on December 6, 2018; December 10, 2018; December 19, 2018; January 2, 2019; January 10, 2019; February 18, 2019; April 10, 2019; May 21, 2019; June 3, 2019; June 5, 2019; June 6, 2019; June 12, 2019; June 28, 2019; July 16, 2019; July 24, 2019; July 25, 2019; July 26, 2019; July 29, 2019; August 5, 2019; August 6, 2019; August 13, 2019; August 15, 2019; August 22, 2019; August 27, 2019. Doc. 16-1, Sales Orders, 31–82. The April 10, 2019, order allegedly included the SKOL Pods at issue in this dispute. *See id.* at 43.

The Court finds that Empire has not established minimum contacts with Texas to support personal jurisdiction on this breach-of-contract claim. First, and most importantly, the claimed injury is not based on a breach of any contract *with Empire or by Empire. See supra* note 6; *Danziger & De Llano,* 24 F.4th at 502 (analyzing the "connection between the alleged contract and Texas"); *G-2 Automated Techs., LLC v. Aleco, Inc.*, 2012 WL 2358147, at *2 (N.D. Tex. June 21, 2012) ("In order to establish specific jurisdiction, [Plaintiff] must show that [Defendant's] contacts with Texas emanate from or are directly related to the asserted breach of contract claim.").

However, even if the breach was based on an Empire contract, Empire's course of dealings with Worldwide would not establish minimum contacts with Texas. While Empire's contracts with Worldwide were more numerous than the Silver State contracts discussed above, their connection to Texas is similarly unsubstantial. *See id.* at 31–82; *Stuart,* 772 F.2d at 1194 ("The quality of the contacts as demonstrating purposeful availment is the issue, not their number."). There is no evidence that any of these orders was placed in Texas or that Empire contracted with Worldwide because of Worldwide's location in Texas. *See* Doc. 16-1, Sales Orders, 31–82. The contracts were for individual shipments, not a significant ongoing relationship that would give rise to a long-term

- 14 -

connection with the forum state. *Id.* Further, each invoice reflects that the contracted goods were shipped by Worldwide in Texas to Empire in California, so only Worldwide was to perform in Texas or controlled any performance in Texas. *Id.* Finally, mere remittance of payment to a seller in Texas is not sufficient to establish minimum contacts with the state. *See Stuart*, 772 F.2d at 1194 ("[T]he mailing of payments to the forum do[es] not constitute the minimum contacts necessary to constitutionally exercise jurisdiction."). In sum, these contracts are generally connected to Texas by Plaintiff's—not Empire's—actions, which will not support the exercise of personal jurisdiction over Empire. *See Moncrief*, 481 F.3d at 311.

Further, the Court finds that the early 2019 visit by the "procurement manager employed by Silver State and/or Empire" to Worldwide's Texas premises "to discuss business," Doc. 16-1, Kahn Aff., ¶ 17, did not create minimum contacts sufficient for the Court to exercise jurisdiction over Empire for the instant breach-of-contract claim. Though even a single contact of sufficient quality can support a finding of specific jurisdiction, *see Moncrief*, 481 F.3d at 311, that is not the case here for two reasons.

First, Plaintiff alleges that the "Silver State and/or Empire" employee was a "procurement manager." Doc. 16-1, Kahn Aff., ¶ 17. As discussed above, since the contracts occurring between the parties around the time of the visit, in early 2019, were all sales *by Worldwide to Empire*, for products to be shipped to California, the reasonable inference to draw is that the procurement manager's purpose was to discuss *procuring* products *from* Worldwide for Empire's California operations. *See* Doc. 16-1, Sales Orders, 31–82. So, there is no evidence to show that Empire was seeking, by this procurement manager's visit, to purposefully avail itself of the protections and benefits of Texas law by soliciting business from Texas. *Cf. Hydrokinetics*, 700 F.2d at 1027–28

- 15 -

(affirming the district court's conclusion that the visit by two of the defendant's executives to the plaintiff's Texas facility did not establish minimum contacts where the visit was not part of "any calculated effort to engage in or solicit business in Texas with a Texas company" and was not made with "any expectation of extracting profits" from the Texas plaintiff.). To the contrary, Plaintiff was likely seeking to extract profits from Empire in California by these contracts.

Second, even if the procurement manager's visit did constitute minimum contacts for an injury arising out of one of Worldwide's subsequent contracts with Empire, the instant dispute has only an attenuated relationship to any such Empire contract. The Court has found that Worldwide's breach-of-contract claim arises from the oral contract made between Worldwide and Angel on behalf of *Silver State*. *See* Doc. 1-5, Original Pet., ¶¶ 9–11; *see supra* note 6. To the extent that Worldwide alleges an indirect connection between the claimed breach and the April 10, 2019, Empire order—namely, that the August 9, 2019, Silver State JUUL Pods order was part of a scheme Angel cooked up to allow him to return the months-old SKOL Pods, *see* Doc. 16-1, Kahn Aff., ¶ 17—such an attenuated relationship between the contact and the injury-producing contract does not justify exercising personal jurisdiction over Empire in Texas. *See Moncrief*, 481 F.3d at 312 ("Random, fortuitous, or attenuated contacts are not sufficient to establish jurisdiction." (citing *Burger King*, 471 U.S. at 476)).

      *iii.*    *Angel*

Finally, Plaintiff asserts that Angel is an officer of Silver State and Empire who personally made representations inducing Worldwide to enter the underlying transaction. Doc. 14, Resp., 8. However, the record does not include sufficient evidence to show that Angel, acting in his individual capacity and not as an officer or agent of Silver State or Empire, established minimum contacts with

- 16 -

Texas related to the breach-of-contract claim. *See Panda Brandywine*, 253 F.3d at 869.

As explained *supra* note 6, Worldwide does not plead that Angel hid his status as an agent contracting on behalf of Silver State for the August 9, 2019, JUUL Pods order. Instead, the pleadings and Kahn's affidavit allege that Angel acted on behalf of Silver State, arranged for payment to Silver State, and promised shipment from Silver State. *See* Doc. 1-5. Original Pet., ¶¶ 39–40; Doc. 16-1, Kahn Aff., ¶ 3 ("[Worldwide] placed an order with Silver State . . . in the amount of $736,992. . . . Silver State stated that the order would be filled in approximately two weeks."). Lacking any evidence of agreement to the contrary, under Texas law, Angel is not individually a party to the contract. *See, e.g., Instone Travel Tech Marine & Offshore v. Int'l Shipping Partners, Inc*., 334 F.3d 423, 428 (5th Cir. 2003) (stating that under Texas law "[i]t is well established that an agent acting for a disclosed principal is not liable for claims arising out of contracts executed by the agent on behalf of its principal" unless the parties have "alter[ed] this general rule by agreement"). Thus, the fiduciary shield doctrine would preclude this Court from exercising personal jurisdiction over Angel for the breach-of-contract claim, even if his actions on behalf of Silver State otherwise constituted minimum contacts with Texas. *See Organic Metals v. Aquasium Techs*., Ltd., 2004 WL 718960, at *3 (N.D. Tex. Apr. 2, 2004) ("[T]he fiduciary-shield doctrine prohibits a court from exercising personal jurisdiction over an individual whose only actions in the forum state were taken in the individual's capacity as a corporate representative, even if the court has personal jurisdiction over the corporation itself.") (citing *Stuart*, 772 F.2d at 1197).

To be clear, the fiduciary-shield doctrine does not shield an individual from the consequences of their own tortious actions in the forum state. *Gen. Retail Servs., Inc. v. Wireless Toyz Franchise, LLC*, 255 F. App'x 775, 795 (5th Cir. 2007) ("[W]hile the fiduciary-shield doctrine could prohibit

this court from ascribing acts of the [corporation] to [its officer], it does not prohibit [the officer] from being held personally liable for his own tortious conduct simply because he is an officer of a corporation."); *see Lewis v. Fresne*, 252 F.3d 352, 359 n.6 (5th Cir. 2001) ("[Plaintiff] contends that [Defendant] deliberately misled him . . . Therefore, the fiduciary shield doctrine should not apply."). This does not change the result here, for two reasons.

First, Worldwide has not brought a fraud claim against Angel or asserted that he acted in his own personal, not Silver State's, interest. *See* Doc. 1-5, Original Pet., ¶¶ 38–70 (presenting claims for breach of contract, conversion, breach of implied warranty of merchantability, and DTPA violations); *Nat'l Union Fire Ins. Co. of Pittsburgh v. Puget Plastics Corp.*, 532 F.3d 398, 402 (5th Cir. 2008) ("[K]nowing violations of the DTPA are not intentional torts."); *cf. Gen. Retail Servs., Inc.*, 255 F. App'x at 795 (finding sufficient minimum contacts based on a corporate officer's allegedly fraudulent misrepresentations *in a fraud case*); *McAfee, LLC v. Kinney*, 2019 WL 4077647, at *6 (E.D. Tex. Aug. 29, 2019) (finding personal jurisdiction based on an exchange of text messages where "the text messages [Defendant] sent to [Plaintiff] are the basis of Plaintiff's *intentional torts . . .* causes of action. It is important to note that [Defendant] initiated many of the text conversations, was an active participant in the text conversation he did not initiate, and, at all times during these conversations knew [Plaintiff] lived and worked in Texas." (emphasis added)). In the Fifth Circuit, "[w]hen the actual content of communications with a forum gives rise to intentional tort causes of action, this alone constitutes purposeful availment." *Lewis*, 252 F.3d at 359 (alteration in original) (quoting *Wien Air Alaska, Inc. v. Brandt*, 195 F.3d 208, 213 (5th Cir. 1999)). For a breach-of-contract claim, by contrast, Angel's communications with Kahn and Worldwide in Texas do not alone constitute purposeful availment but are considered in the *Burger King* totality of the

circumstances analysis discussed above.

Second, even if Angel's contacts with Worldwide and Kahn were not shielded and were taken in his individual capacity, they are not sufficient minimum contacts with Texas for this breach-of-contract claim. The record indicates that "Angel himself contacted [Worldwide], a company located in . . . Texas . . . to induce [Worldwide] into approving [the Order]," Doc. 16-1, Kahn Aff., ¶ 14, and that Angel and Kahn exchanged texts about the SKOL Pods and about the JUUL Pod refund,[8] Doc. 16-1, Text Messages, 93–97. Worldwide does not allege that Angel traveled to Texas in the course of his dealings with Worldwide or that any of his communications with Kahn took place in Texas. *See* Doc. 16-1, Kahn Aff. Angel avers that his only travel to Texas has been an airport layover. Doc. 10, Mot., 17. There is no evidence that Angel contracted or sought to do business with Kahn because of Kahn's location in Texas. *See generally* Doc. 16-1, Suppl. Docs., Doc. 1-5, Original Pet. In sum, applying the *Burger King* analysis outlined above, Angel individually did not establish minimum contacts with Texas, for the breach-of-contract claim, by his texts with Kahn or by other actions related to this contract.

2.   Conversion

Plaintiff and Defendants have focused their argument on the breach-of-contract claim. *See* Doc. 10, Mot.; Doc. 14, Resp.; Doc. 15, Reply; Doc. 16, Sur-Reply; Doc. 21, Sur-Sur-Reply. Despite the fact that specific jurisdiction is claim-specific, neither party has presented argument on whether the Court may exercise specific jurisdiction over Defendants on the conversion, implied warranty of merchantability, or DTPA violations claims. *See id.*; *Seiferth,* 472 F.3d at 274. Nevertheless, the

---

[8] The Court notes that the date on the "true and correct" copy of the text messages related to the SKOL Pods is not in a format that the Court can read. *See* Doc. 16-1, Text Messages, 88. The Kahn Affidavit gives the date of these messages as ranging from July 23, 2019, through July 30, 2019. Doc. 16-1, Kahn Aff., ¶ 11. However, the date of these communications would not affect the Court's analysis.

Court briefly addresses each additional claim.

　　Plaintiff brings the tort claim of conversion against Defendants for not refunding more than half of the money that Worldwide paid for the JUUL Pods. Doc. 1-5, Original Pet., ¶¶ 50–57. "A forum State's exercise of jurisdiction over an out-of-state intentional tortfeasor must be based on intentional conduct by the defendant that creates the necessary contacts with the forum." *Trois*, 882 F.3d at 490 (quoting *Walden v. Fiore*, 571 U.S. 277, 286 (2014)). A nonresident is subject to personal jurisdiction when, in the course of business, "it commits a tort in whole or in part in [Texas]." *Pervasive Software Inc.*, 688 F.3d at 229. Under Texas law, the intentional tort of conversion occurs when a defendant commits "the wrongful exercise of dominion and control over another's property in denial of or inconsistent with his rights." *Id.* (quoting *Bandy v. First State Bank, Overton, Tex.*, 835 S.W.2d 609, 622 (Tex. 1992)). "The mere fact that the converted item originated in Texas is not sufficient to create personal jurisdiction under the long-arm statute; the item must be in Texas when the conversion actually occurs." *Id.* at 230.

　　Here, Worldwide willingly transferred the money from Texas to Silver State in California. Doc. 1-5, Original Pet., ¶¶ 12, 51, 53. The alleged conversion did not occur until the Defendant refused to return the $368,992 from California. *Id.* Therefore, the Court finds that it cannot exercise of personal jurisdiction over Defendants on the conversion claim. *See Bandy*, 835 S.W.2d at 622.

　　3.　　Implied Warranty of Merchantability

　　Plaintiff claims that Defendants violated the implied warranty of merchantability by shipping the nonconforming SKOL Pods product. Doc. 1-5, Original Pet., ¶¶ 58–64. When an implied warranty of merchantability claim is attached to personal injury or products liability claims, courts may apply the stream-of-commerce theory of specific personal jurisdiction, which "recognizes that

a defendant may purposely avail itself of the protection of a state's laws—and thereby will subject itself to personal jurisdiction—'by sending its goods rather than its agents' into the forum." *See Carlton v. Olympus Corp. of Ams.*, 2019 WL 6037322, at *5 (W.D. Tex. July 26, 2019) (quoting *J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 882 (2011), *report & recommendation adopted*, 2019 WL 6037277 (W.D. Tex. Aug. 23, 2019)); *cf. Luv N' care, Ltd.*, 438 F.3d at 472–73 (noting that the Fifth Circuit "has been reluctant to extend the stream-of-commerce principle outside the context of products liability cases" except where "the same public policy concerns that justify use of the stream-of-commerce principle in the products liability context are present").

By contrast, where—as here—the claim involves alleged injury to a contracting party that cannot sell allegedly unmarketable goods, the *Burger King* test applies. *See Source Network Sales & Mktg., LLC v. Ningbo Desa Elec. Mfg. Co.*, 2015 WL 2341063, at *10 (N.D. Tex. May 15, 2015) ("These contacts establish specific personal jurisdiction over [Defendant] with respect to the breach of contract and breach of implied warranty of merchantability claims. The contacts furthered the contractual relationship between the parties and thus 'relate[ ] to' the contract-based claims."). Therefore, for the same reasons as the breach-of-contract claims discussed above, the Court finds that no Defendant has established sufficient minimum contacts to support the Court's exercise of specific personal jurisdiction on the breach of implied warranty of merchantability claim.

4.    DTPA Violations

In the intentional tort context, the Fifth Circuit has held that "a single act. . . directed toward Texas that gives rise to a cause of action . . . can support a finding of minimum contacts." *Wien Air Alaska*, 195 F.3d at 211 (citing *Calder v. Jones*, 465 U.S. 783 (1984)). However, as noted above in the discussion of Angel's contacts relevant to the breach-of-contract claim, the Fifth Circuit has also

held that "knowing violations of the DTPA are not intentional torts." *Puget Plastics Corp.*, 532 F.3d at 402. Here, because this DTPA claim arises out of Angel's representations made in solicitation or negotiation of the oral contract—the source of the alleged injury—the Court finds that the *Burger King* analysis is appropriate. *Cf. First Metro. Church of Hous. v. Genesis Grp.*, 2015 WL 11170733, at *1 n.9 (S.D. Tex. Mar. 3, 2015) (finding that because the facts supporting the plaintiff's DTPA claim were "mere restatements of Plaintiff's breach of contract claim . . . the jurisdictional analysis is therefore based on the substantive claim alleged—not a mischaracterization of the claim as 'DTPA'"), *aff'd*, 616 F. App'x 148 (5th Cir. 2015). Therefore, for the same reasons as given above, the Court finds no sufficient minimum contacts by any Defendant for the DTPA claim.

To conclude, the Court finds that no Defendant established minimum contacts with Texas for any claim presented. Therefore, the Court need not conduct a fairness-factors analysis. *Stuart*, 772 F.2d at 1191–992 ( "[T]he fairness factors cannot of themselves invest the court with jurisdiction over a nonresident when the minimum-contacts analysis weighs against the exercise of jurisdiction."). Further, because the Court has found that it lacks personal jurisdiction over the Defendants, it does not consider Defendants' arguments for dismissal pursuant to Rule 12(b)(5). *See Smith v. Skopos Fin., LLC*, 2019 WL 2374883, at *6 (N.D. Tex. Jan. 22, 2019), *report & recommendation adopted*, 2019 WL 1552033 (N.D. Tex. Apr. 10, 2019). In sum, for all the reasons given above, the Court **GRANTS** Defendants' motion to dismiss Plaintiff's claims, pursuant to Rule 12(b)(2), for lack of personal jurisdiction.

## IV.

## CONCLUSION

For the reasons stated above, the Court **GRANTS** Defendants' Motion to Dismiss (Doc. 10). The claims against Defendants are **DISMISSED WITHOUT PREJUDICE** for lack of personal jurisdiction, pursuant to Rule 12(b)(2).


       **SO ORDERED**.

       **SIGNED: May 3, 2022.**

       JANE J. BOYLE
       UNITED STATES DISTRICT JUDGE